IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN HARRISON,<br><br>        Plaintiff,<br><br>v.<br><br>JOANNE B. BARNHART, Commissioner of Social Security,<br><br>        Defendant.<br>_____/ | No. C 06-00321 SBA<br><br>**ORDER** |

Plaintiff Alan Harrision ("Plaintiff") brings this action pursuant to the judicial review provision of the Social Security Act, 42 U.S.C. § 405(g), to obtain review of a decision by the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff Social Security disability benefits and supplemental security income ("SSI"). Now before the Court are Plaintiff's Motion for Summary Judgment or Remand ("Motion") and Defendant's Cross-Motion for Summary Judgment ("Cross-Motion").

## **BACKGROUND**

**A.  Procedural History**

Plaintiff applied for supplemental security income ("SSI") benefits pursuant to Title XVI of the Social Security Act ("the Act") on September 10, 2003, claiming a disability that began on August 11, 2003. Tr. 75-77. Plaintiff alleged mental illness that prevent him from working. Plaintiff's claim was denied initially and on reconsideration. Tr. 29-38. A request for a hearing was timely filed on May 11, 2004. Tr. 39.

A hearing was held before an Administrative Law Judge ("ALJ") on March 8, 2005 in Oakland, California. Plaintiff appeared with counsel and testified. Tr. 280-314. On June 1, 2005,

the ALJ concluded that Plaintiff is not under a "disability," as the term is defined in the Social Security Act and Regulations. Tr. 16. The ALJ found that "[s]ince claimant has only non-exertional limitations, the Medical-Vocational rules do not apply in this case." Tr. 22. A Vocational Expert (VE) testified that "there are a significant number of jobs in the national economy that can be performed by a hypothetical individual with the claimant's vocational profile and a residual functional capacity." Tr. 22. The ALJ concluded that considering the claimant's age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy. Tr. 23.

The Plaintiff filed a request for review by the Appeals Council on July 13, 2005. Tr. 12. On November 18, 2005, the Appeals Council denied review, and noted that the denial meant that the decision of the ALJ was a final decision of the Commissioner of Social Security. Tr. 5-8. The plaintiff then filed for review in this Court on January 18, 2006. [Docket No. 1.]

On May 31, 2006, Plaintiff filed his Motion for Summary Judgment or Remand. [Docket No. 7.] On July 31, 2006, Defendant filed its Opposition to Plaintiff's Motion and filed a Cross-Motion for Summary Judgment. [Docket No. 12.] On August 29, 2006, Plaintiff filed his Reply Memorandum. [Docket No. 16.]

**B.     Factual Background**

   **1.     Plaintiff's Disability Claim**

In his pre-hearing brief filed on May 31, 2006, Plaintiff alleged that he is disabled and unable to work by reason of mental illness. Plaintiff's first contention was that his disability derives from his mild mental retardation coupled with another physical or mental impairment, imposing an additional and significant work-related impairment under Listing 12.05(C). Plaintiff alleges in the alternative that he is also disabled and unable to work as a result of his psychotic disorder, mood disorder, and/or schizophrenia, pursuant to Listing 12.03.

   **2.     Plaintiff's Testimony**

At the hearing, Plaintiff testified regarding his mental illness, specifically stating that he hears voices, has evil thoughts, and feels depressed. He explained that he has been hearing voices since he was 17. Tr. 290. Plaintiff also discussed his suicide attempts, once inside the California

Youth Authority ("CYA") which was prevented by a guard during an inmate count, and once at home which was prevented by his father who discovered him in the garage with a knife. Tr. 298.

### 3. Medical Evidence

Plaintiff is a 26 year-old male with a history of incarceration as a juvenile with extensive psychiatric treatment and evaluation by the CYA. Motion at 2. Plaintiff first became involved with the criminal justice system at age 13 when he was arrested for theft. Tr. 156. He was committed to CYA in 1997 for violation of Penal Code § 487(c), grand theft from a person. Tr. 156. Plaintiff was released in October 1999, but his parole was revoked and he returned to CYA in March 2000. Tr. 145. After showing aberrant behavior in custody, Plaintiff was transferred to the intensive treatment program on July 5, 2001. Tr. 153. He was transferred to another facility in May 2002, to attend treatment groups and to gain some trade experience. Tr. 153. Plaintiff's actual commitment time expired on April 5, 2005. Tr. 153.

#### a. Evaluations by the California Youth Authority during Commitment

On October 23, 2002, Purna C. Datta, Ph.D., performed a psychological evacuation at the request of the Plaintiff's parole officer from the State of California Department of the Youth Authority. Tr. 152-160. Dr. Datta's assessment included: 1) review of Plaintiff's field file; 2) review of behavioral reports; 3) clinical interview; 4) direct observation of behavior; 5) Mental Status Examination; 6) Rey-15 Memory Test; 7) Bender Gestalt Visual Motor Test ("BGVMT"); 8) Shipley Institute of Living Scale ("SILS"); 9) Carlson Psychological Survey ("CPS"); and 10) Projective drawings of the House-Tree-Person Test. Tr. 157.

In his review of the field files and behavioral reports, Dr. Datta outlined all of the evaluations performed on the Plaintiff while in the CYA.

1. On February 5, 1998, Plaintiff was evaluated by Sharon Winter, Ph.D. at the Northern Youth Correctional Reception Center Clinic, ("NYCRCC"), using Minnesota Multiphasic personality Inventory ("MMPI"), Carlson Psychological Survey, ("CPS"), Projective Drawings of House-Tree-Person, and Bender Visual Motor Gestalt Test. Plaintiff was diagnosed with Conduct Disorder, onset unknown, Alcohol Abuse, Cannabis Abuse, and Developing Antisocial tendencies. Tr. 153.

3

2. On February 18, 1999, Bert Kopell, M.D., Training Consultant in psychiatry at Karl Holton Youth Correctional Facility ("KHYCF"), evaluated Plaintiff and diagnosed him with Conduct Disorder and Alcohol Abuse. Dr. Holton thought Plaintiff's intelligence was in the dull-normal range and showed no signs of thought disorder, depression or anxiety and suggested psychotherapy or pharmacotherapy. Tr. 154.

3. On December 21, 2000, Plaintiff was again evaluated by Sharon Winter, Ph.D. at NYCRCC using Adolescent Multiphasic personality Inventory ("AMPI"), Million Clinical Multiaxial Inventory-III ("MCMI-III"), CPS, and Projective Drawings of the House-Tree-Person. Dr. Winter noted regression since she last saw him, and diagnosed Plaintiff with Adjustment Disorder with mixed anxiety and depressed mood, Schizoid Personality (rule out Schizotypal Personality) Disorder, and assigned him a GAF[1] of 35 (needing intensive treatment program). Tr. 154.

4. On June 14, 2001, Plaintiff was evaluated by Purna C. Datta, Ph.D. at DeWitt Nelson Youth Correctional Facility ("DWNYCF") resulting from Plaintiff's bizarre behavior of smearing feces in the lockup room, as well as other acts and "suicidal behavior." Plaintiff admitting this behavior was his "primitive way" of getting attention. Dr. Datta diagnosed Plaintiff with Cyclothymic Disorder, Alcohol Abuse, Attention-Deficit/Hyperactivity Disorder (hyperactive-impulsive type), Conduct Disorder, adolescent onset, solitary aggressive type (now turning into antisocial personality disorder), Personality Disorder NOS ("Not Otherwise Specified"), with mixed borderline, Schizoid, paranoid and antisocial features, and assigned a GAF of 55. Tr. 155.

In his clinical interview, Dr. Datta observed that Plaintiff was polite and cooperative. There were no symptoms of a thought disorder or of active psychotic processes, but his abstract thinking

---

[1] The GAF Scale is a 100-point single-item rating scale for evaluating overall psychosocial functioning during a specified time period on a continuum from psychological sickness to health. The GAF scale values range from 1 to 100, representing the hypothetically sickest person to the hypothetically healthiest. The scale is divided into 10 equal 10-point intervals. Spitzer, R. L., Gibbon, M., Williams, J., & Endicott, J. (1996), *Global Assessment of Functioning (GAF) Scale*. In L. I. Sederer & B. Dickey (Eds.), *Outcomes assessment in clinical practice*, 76-78.

4

and attention to tasks were sub-average. Plaintiff had good eye contract and his speech was clear and easily understandable. He did not appear to be suffering from significant symptoms of depression or anxiety. His thought processes were organized and coherent. His affect was appropriate and he appeared to be in control of his thoughts and feelings. His memory for short term and long term information appeared to be intact. Tr. 157.

On the Rey-15 Memory Test, Plaintiff received a perfect score of 15/15, indicating average immediate memory and lack of effort to malinger symptoms of psychopathology. Tr. 157-58. On the Bender Gestalt Visual Motor Test, Plaintiff received a score of 2, indicating average visual motor skills. Tr. 158. On the Shipley Institute of Living Scale, to assess his estimated verbal intelligence, Plaintiff received a T-score of 31 on the Verbal subtest and a T-score of 38 on the Abstract Reasoning subtest, and his estimated full-scale I.Q. equivalent was 75, placing him in the borderline range of intellectual functioning. Tr. 158.

Plaintiff was evaluated using two personality measures – the Carlson Psychological Survey and the Projective Drawings of House-Tree-Person Test. The CPS generated a personality profile of Type 9. The Projective Drawings of House-Tree-Person Test indicated Plaintiff's poor cognitive abilities but did not indicate the presence of any serious psychopathology. Tr. 158.

In his DSM-IV-TR[2] Diagnosis, Dr. Datta concluded:

| | | |
|---|---|---|
| Axis I: | 301.13 | Cyclothymic Disorder (mild form and in remission) |
| | 314.01 | Attention-Deficit/Hyperactivity Disorder (Hyperactive/Impulsive Type) |
| | 312.8 | Conduct Disorder, adolescent onset, solitary aggressive type (now in remission as he is taking responsibility) |
| | 305.00 | Alcohol Abuse (institutional abstinence) |
| | 305.2 | Cannabis Disorder, by history |
| Axis II: | 310.9 | Personality Disorder NOS, with mixed schizoid, borderline, paranoid and antisocial features |

---

[2] Diagnostic and Statistical Manual of Mental Disorders, Text Revision, Fourth Edition, May 2000.

5

| | |
|---|---|
| Axis III. | No Diagnosis on Axis III |
| Axis IV: | Psychosocial stressors: Mild related to paroling to his parents |
| Axis V: | Current GAF = 74 |

Tr. 159. Dr. Datta strongly recommended that Plaintiff see a licenced psychiatrist and undergo psychotherapy, as well as aftercare counseling/family therapy to address his issues of abandonment and rejection. Dr. Datta also felt that Plaintiff may benefit from medication during his transition time to the community. Tr. 160.

### b. Evaluations After SSI Claim was Filed on September 10, 2003.

#### i. Marinos Evaluation

On December 18, 2003, Janine Marinos, Ph.D. of the Bayview Medical Clinic in Richmond, California, performed a psychological evaluation to aid in the assessment of Plaintiff's disability and to provide diagnostic impressions to the Social Security Administration. When asked about his disability, Plaintiff reported hearing voices and seeing demons. He said, "I can't live a normal life like other people because I am different and odd and strange to others and myself." Tr. 163.

Dr. Marinos' assessment included: 1) review of the psychological evaluation conducted on October 23, 2002; 2) review of previous evaluations; 3) pre-test clinical interview; 4) direct observation of behavior; 5) Mental Status Examination; 6) Wechsler Adult Intelligence Scale-III ("WAIS-III"); 7) Wechsler Memory Scale-III ("WMS-III") Logical Memory I/II, Faces I/II; 8) Bender Gestalt Test; 8) Rey-15 Memory Test. Tr. 162.

Dr. Marinos noted in the report that Plaintiff was generally cooperative, but his level of effort on testing was questionable. As a consequence, the results of the evaluation may underestimate his true cognitive abilities. Tr. 164.

On the WAIS-III IQ's, Plaintiff achieved a 70 IQ on verbal, a 74 IQ on performance, and a full-scale IQ of 69. This evaluation was limited in scope and based on a single, time-limited session with Plaintiff. Dr. Marinos made the following diagnosis:

| | |
|---|---|
| Axis I: | Deferred |
| Axis II: | Antisocial Traits<br>Rule out Borderline Intellectual Functioning |

6

Axis III:                      No Diagnosis

Dr. Marinos stated that her diagnosis in this case was unclear. However, she opined that Plaintiff's complaints of vague auditory hallucinations and seeing demons were not indicative of the presence of an overt psychotic disorder. Based solely on the current evaluation and from a strictly cognitive and emotional standpoint, Plaintiff appeared to understand, remember and carry out simple instructions and to maintain adequate concentration, persistence, or pace for simple tasks. He seems to have the capacity to respond appropriately to others. Tr. 165-66.

### ii.    Contra Costa County Mental Health Clinic

Plaintiff was treated by the Contra Costa County Mental Health Clinic from December 31, 2002, to February 25, 2004, where his primary complaints were hearing voices and being depressed. Plaintiff's last evaluation on February 25, 2004, the progress note indicates a diagnosis of psychotic disorder with Post Traumatic Stress Disorder ("PTSD"). Plaintiff reported having flashbacks from when he was incarcerated. This evaluation indicated that Plaintiff was stabilized on medication. Tr. 169-70.

### iii.    Mental Residual Functional Capacity Assessment on Jan. 14, 2004

A Mental Residual Functional Capacity Assessment, (Form SSA-4734-F4-Sup), dated January 14, 2004, conducted by Ida Hilliard, M.D. from the Disability Determination Services ("DDS"), concluded that Plaintiff is Not Significantly Limited in any category. Dr. Hilliard concluded that Plaintiff is Moderately Limited in: 1) the ability to understand and remember detailed instructions; 2) the ability to maintain attention and concentration for extended periods; 3) the ability to interact appropriately with the general public; and 4) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 177-82.

Dr. Hilliard concluded that Plaintiff had been diagnosed with Borderline intellectual functioning, and Personality disorder, NOS. However, she felt that Plaintiff is capable of performing simple, repetitive tasks on a sustained and independent basis, with limited contact with others. Tr. 182.

### iv.    Psychiatric Review Technique on April 29, 2004

A Psychiatric Review Technique, (Form SSA-2506-BK), dated April 29, 2004, was

7

conducted by Robert Y. Hood M.D., Psychiatric Consultant for the DDS. Dr. Hood concluded that Plaintiff has borderline intellectual functioning, a personality disorder NOS, with antisocial traits, mental impairments that cause Plaintiff to have mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace. Dr. Hood noted that there is no evidence of any episodes of decompensation. Tr. 187-200.

### v.     Correspondence from James R. Stueland, MFT, on Jan. 5, 2004

In a correspondence dated January 5, 2004, James R. Stueland, MFT (Marriage Family Therapist), stated that since he has been Plaintiff's therapist and counselor since October 23, 2003, Plaintiff has shown improvement in his behavior and mental state. He is compliant with medications for depression. Plaintiff reported no drug usage. Plaintiff informed Mr. Stueland that his goal was to become a certified nurse assistant. Tr. 206-07.

### vi.     Psychiatric Vocational Evaluation on May, 19, 2004

On May 19, 2004, Stephen A. Levine, M.D. performed a psychiatric evaluation at the request of the Department of Rehabilitation. During the interview, Plaintiff reported being a "slow learner," but was never diagnosed with a learning disorder. Tr. 210. Plaintiff had a history of special education classes and tutors, but was asked to repeat a year. Plaintiff graduated from high school. Tr. 209.

On the mental status examination, Dr. Levine reported that Plaintiff was "oriented to person, place, and time." Tr. 210. Furthermore, "his memory was intact for immediate, recent, and remote material. He recalled three items after ten minutes. He was able to complete simple calculations in his head, his fund of general information was adequate, and he hd no apparent difficulty paying attention or concentrating." Tr. 210. Dr. Levine estimated Plaintiff's IQ to be in the low average range. Tr. 210.

Dr. Levine made the following diagnosis:

| | | |
|---|---|---|
| Axis I: | 296.9 | Mood Disorder NOS |
| Axis II: | 799.90 | Diagnosis Deferred, (Obsessive-Compulsive Traits) |
| Axis III: | | No Diagnosis |

8

| | | |
|---|---|---|
| Axis IV: | | Unemployment |
| Axis V: | | GAF 50 |

In conclusion, Dr. Levine stated that because one of Plaintiff's brothers has been diagnosed with Schizophrenia, he was suspicious about the possibility that Plaintiff also may have the disorder. However, Dr. Levine did not see any clear signs of Schizophrenia. Tr. 210-11.

### vii. Psychological Evaluation on June 17, 2004

On June 17, 2004, licensed psychologist V.L. Sternitzke, Ed.D., performed a psychological evaluation on behalf of the California Department of Rehabilitation. Dr. Sternitzke's evaluation included: 1)Wechsler Adult Intelligence Scale-III ("WAIS-III"); 2) Bender Motor Gestalt Test; 3) Wide Range Achievement Test; 4) Nelson-Denny Reading Test; 5) Minimult, a truncated form of the Minnesota Multiphasic Personality Inventory ("MMPI"). Tr. 212-15.

Dr. Sternitzke noted in his report that Plaintiff was generally cooperative and no testing impairments were in evidence. "No practice effect on this test was detected." Tr. 213. On the WAIS-III IQ's, Plaintiff achieved a 74 IQ on verbal, a 77 IQ on performance, and a full-scale IQ of 72. Two new scales were offered on the WAIS-III, verbal comprehension at 74, and perceptual organization at 80. Tr. 213.

On the Wide Range Achievement Test, the results indicated normal achievement in reading and arithmetic, underachievement in no subjects, and some overachievement in spelling. Tr. 214.

Dr. Sternitzke made the following diagnosis:

| | | |
|---|---|---|
| Axis I: | 315.2 | Disorder of Written Expression, Mild Mathematics |
| | 315.1 | Disorder, Mild Learning Disorder NOS. Mild Memory |
| | 315.9 | and Gestalt Dysfunction Development Coordination |
| | 315.4 | Disorder, Mild Schizophrenia, |
| | 295.30 | Paranoid Type, Severe |
| Axis II: | V62.89 | Borderline Intellectual Functioning |

Tr. 214.

### viii. Contra Costa Mental Health Treatment Notes from December 5,

9

**2003 to January 31, 2005.**

Medical records from the Contra Costa Health Services encompass treatment from December 5, 2003, to January 31, 2005, primarily for depression and hemorrhoids. A September 3, 2004, progress note states that Plaintiff is "motivated for change and setting goals." Tr. 217. Another progress note dated December 3, 2005, states that Plaintiff's depression was well controlled by Prozac. Tr. 254.

### 4.     Vocational Expert's Testimony

The VE was asked by the ALJ to assess what jobs exist for a hypothetical individual in Plaintiff's situation, namely 24 years of age, with a high school diploma and a full-scale IQ of 72, and the specific learning disabilities found by Dr. Sternitzke on June 17, 2004. The ALJ further stated that the hypothetical individual is limited to the performance of simple repetitive tasks, that is, he is able to understand, remember, and carry out three step instructions. The individual is further limited by his slight difficulties in interacting with co-workers, moderate difficulties in interacting with supervisors, and is precluded from working with the general public. Tr. 309.

The VE testified that the hypothetical individual could perform the tasks necessary as a cleaner, as this type of work is isolated from the public and a supervisor need only give the instructions at the beginning of the shift. Tr. 309. Additionally, a cleaner works alone and potential co-worker interaction is eliminated. Tr. 310.

### B.     Summary of ALJ's Findings

After consideration of the entire record, the ALJ made the following findings regarding the Plaintiff's alleged disability:

1. The claimant has not engaged in substantial gainful activity since August 11, 2003.

2. The claimant has borderline intellectual functioning, and a personality disorder not otherwise specified with antisocial traits, a combination of mental impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. § 416.920(b).

3. The medically determinable mental impairments, either singly or in

|   |   |   |
|---|---|---|
|   |   | combination, do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. |
|   | 4. | The claimant's allegations regarding his limitation are not entirely credible. |
|   | 5. | The claimant retains the residual functional capacity to perform simple and repetitive tasks.  He has slight difficulties in interacting appropriately with co-workers, moderate difficulties in interacting appropriately with supervisors and cannot be closely supervised, he is precluded from working with the general public, and he has moderate limitations in maintaining attention and concentration for extended periods. |
|   | 6. | The claimant has no past relevant work (20 C.F.R. § 416.965). |
|   | 7. | The claimant is currently a younger individual (20 C.F.R. § 416.963). |
|   | 8. | The claimant has a high school education (20 C.F.R. § 416.964). |
|   | 9. | Based on the testimony of the vocational expert, and considering the claimant's age, education, work background, and residual functional capacity, there are a significant number of jobs in the national economy that Plaintiff could   perform.  Examples of such jobs include work as a cleaner.  Plaintiff is therefore not disabled. |
|   | 10. | The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 416.920(f)). |

Tr. 23-24.

Accordingly, the ALJ concluded that Plaintiff was not disabled, and therefore he was ineligible for Social Security disability benefits and SSI.

## **LEGAL STANDARD**

This Court's jurisdiction is limited to determining whether the Social Security Administration's denial of benefits is supported by substantial evidence in the administrative record. 42 U.S.C. § 405(g).  A district court may overturn a decision to deny benefits only if it is not supported by substantial evidence, or if the decision is based on legal error.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The

Ninth Circuit defines substantial evidence as "more than a scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039. The Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998). Rather, the court must "consider the record as a whole, weighing both the evidence that supports and evidence that detracts" from the Commissioner's conclusion. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001). Where the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld. *Andrews*, 53 F.3d at 1041.

## DISCUSSION

In considering whether a claimant is entitled to benefits, an ALJ conducts a five-step sequential inquiry. 20 C.F.R. § 416.920.[3] At the first step, the ALJ considers whether the claimant is engaged in substantial gainful activity. If the claimant if not engaged in substantial gainful activity, the second step asks whether the claimant has a severe impairment (i.e. an impairment that has a significant effect on the claimant's ability to function). If the claimant has a severe impairment, the third step asks whether the claimant has a condition which meets or equals the conditions outlined in the Listings of Impairments in Appendix 1 of the Regulations (the "Listings"). If the claimant does not have such a condition, the fourth step asks whether the claimant is capable of performing his past relevant work. If the claimant is not capable of performing past relevant work, the fifth step asks whether the claimant is capable of performing other work which exists in substantial numbers in the national economy. 20 C.F.R. § 404.1520(b)-404.1520(f)(1).

Here, the ALJ found that Plaintiff has not engaged in significant gainful activity since August 11, 2003, and therefore, step one was established. Tr. 17. At step two, the ALJ found that Plaintiff's "impairments, in combination, are 'severe,' i.e., they more than minimally affect the claimant's ability to perform basic work activities." Tr. 17.

---

[3]The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The burden of proof is on the claimant as to steps one to four. As to step five, the burden shifts to the Commissioner. If a claimant is found to be "disabled" or "not disabled" at any step in the sequence, there is no need to consider subsequent steps.

12

However, at step three, the ALJ held that Plaintiff's impairments did not meet or equal any of the listed impairments in Appendix 1. Tr. 17. At step four, the ALJ made a determination of whether Plaintiff retains the residual functioning capacity ("RFC") to perform the requirements of his past relevant work or other work existing in significant numbers in the national economy. Tr. 17. The ALJ held that Plaintiff has the RFC for "employment that requires simple and repetitive tasks." Tr. 22. Plaintiff's RFC is further restricted by the impairments that preclude him from working with the general public, his slight difficulties interacting with co-workers, moderate difficulties interacting with supervisors and the limitation that he cannot be closely supervised, and finally, Plaintiff's moderate limitations in maintaining attention and concentration for extended periods. Tr. 22.

Since both the ALJ and the VE agreed that Plaintiff had no "past relevant work" as defined in 20 C.F.R. § 416.965 (work must have been performed within the last 15 years or 15 years prior to the date of disability), and because his limited work experiences did not meet the definition of substantial gainful activity, the ALJ held that the burden of proof shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which Plaintiff is able to perform. Tr. 22. The ALJ held because Plaintiff has only non-exertional limitations, the medical-vocational rules do not apply; therefore, the testimony of the VE can help determine whether or not there are significant number of jobs in the national economy that Plaintiff can perform. Tr. 22.

Therefore, based on the testimony of the VE, the ALJ concluded that considering Plaintiff's age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy and Plaintiff is not "disabled." Tr. 23.

**A.    Plaintiff's Arguments**

    **1.    Whether there is substantial evidence to support the ALJ's finding that Plaintiff's Combined Impairments did not meet meet or equal a Listed Impairment.**

Plaintiff claims that the ALJ failed to provide substantial evidence that Plaintiff's combined impairments did not meet or equal one of the listed impairments. Specifically, Plaintiff asserts that the ALJ did not address in the decision Listing 12.03 or 12.05(C). Motion at 10. Plaintiff contends

that he has made a prima facie showing under Listing 12.05(C). Listing 12.05(C) involves a two-prong analysis as set forth in Appendix 1: first, the claimant must have a valid verbal, performance, or full-scale IQ score of 60 to 70; and second, the claimant must have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § 404 subpart P, appendix 1, 12.05(C). The second prong is defined in *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987), as a significant work-related impairment whose effect on a claimant's ability is more than slight or minimal. *See* Motion at 7-8. Furthermore, Plaintiff contends that the ALJ's decision contained little more than a boilerplate statement, and remand is necessary because the ALJ failed to address either Listing or provide a reasoned determination as to whether Plaintiff meets or equals the presumptive definition of disability. Motion at 10-11.

The third step in the disability determination looks at the severity of the impairment and whether the claimed impairments meet or equal the require medical criteria in the listings. The listings detail impairments which are "considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. § 404.1525(a). The listings provide specific medical criteria required for determining whether the plaintiff is disabled by the impairment.

An ALJ must first address whether a Plaintiff's symptoms meet the requirements of the listings. 20 C.F.R. § 404.1526. If a Plaintiff does not meet the required elements, the ALJ must still find a disability if the impairments are medically equivalent to those required in the listing. *Id*. If the ALJ finds that the "symptoms, signs, and laboratory findings" are at least equal in severity and duration to the medical criteria in the listed impairment, then equivalence is established. *Id*. The medical equivalence finding is based on submitted medical evidence along with the opinion of appointed medical consultants. *Id*.

Once a determination is made, the ALJ must detail the equivalency analysis in the decision. See *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). "[I]n determining whether a claimant equals a listing under step three of the Secretary's disability evaluation process, the ALJ must

explain adequately his evaluation of alternative tests and the combined effects of the impairment."[4] *Id*. "A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not [meet or equal a listed impairment]." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). This does not mean, however, that the ALJ must "state why a claimant failed to satisfy every different section of the listing of impairments." *Gonzales v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). The ALJ's decision must be "as comprehensive and analytical as feasible," and when appropriate the ALJ should include "a statement of the subordinate factual foundations which the ultimate factual conclusions are based." *Id*.

In *Gonzales*, the ALJ made a determination that the Claimant did not meet or equal a listed impairments. *Id*. The ALJ's decision was a five-page, single spaced summary of the record, wherein the ALJ summarized the information given by each of the doctors and summarized appellant's testimony. *Id*. The ALJ did not, however, state what evidence supported the conclusion that appellant's impairments do not meet or exceed the Listing of Impairments. The appellant argued that the Secretary committed error by failing to discuss why he did not satisfy the Listing of Impairment. *Id*. The Ninth Circuit held that the ALJ's decision was an "adequate statement of the foundations on which the ultimate factual conclusions are based" and affirmed. *Id*. (citations omitted).

The regulations only require the ALJ to "review the symptoms, signs, and laboratory findings ...." 20 C.F.R. § 404.1526. The ALJ in this case did so; the summary of the evidence, both as to Harrison's physical and mental impairments, was quite thorough. The ALJ therefore properly considered the combination of Plaintiff's impairments when evaluating the application of the Listings, and his decision was supported by substantial evidence. This Court will not second-guess the ALJ's conclusion that Plaintiff failed to meet or equal a Listed impairment.

**2.     Whether the ALJ Properly Rejected the opinions of Plaintiff's Treating and Examining Physicians.**

Plaintiff argues that...

---

[4] The ALJ has wide discretion in where this analysis occurs in the opinion. *See Lewis*, 236 F.3d at 513 ("*Marcia* simply requires an ALJ to discuss and evaluate the evidence that supports his or her conclusion; it does not specify that the ALJ must do so under the heading Finding.").

"The opinion of an examining physician is . . . entitled to greater weight than the opinion of a non-examining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Nevertheless, in appropriate circumstances, the opinion of a treating or examining physician may be disregarded. *Id*. at 831. To reject such opinions, an ALJ must at a minimum give specific and legitimate reason for rejecting the treating physician's opinion and those reasons must be supported by substantial evidence in the record. *Id*. at 830. "[W]hen it is an examining physician's opinion that the ALJ has rejected in reliance on the testimony of a non-examining advisor, reports of the non-examining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

Furthermore, the Ninth Circuit has consistently held that "[t]he ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *see also Allen v. Heckler*, 749 F.2d 577, 580 n.1 (9th Cir. 1985) (stating that "questions of credibility and resolutions of conflicts in the testimony are functions solely for the Secretary").

**3.      Whether the ALJ Properly Rejected Plaintiff's Testimony**

**<u>CONCLUSION</u>**

For the foregoing reasons, IT IS HEREBY ORDERED THAT Plaintiff's Motion for Summary Judgment or Remand is DENIED. Defendant's Cross-Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED THAT the Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated:__1/22/06                                              *Saundra B Armstrong*

SAUNDRA BROWN ARMSTRONG
United States District Judge