1

2

3

4          IN THE UNITED STATES DISTRICT COURT

5          FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    ALAN HARRISON,                              No. C 06-00321 SBA

8              Plaintiff,
                                                 **ORDER**
9    v.

10   JO ANNE B. BARNHART, Commissioner of
     Social Security,

11

12             Defendant.

13   _____/

14         Plaintiff Alan Harrison ("Plaintiff") brings this action pursuant to the judicial review

15   provision of the Social Security Act, 42 U.S.C. § 405(g), to obtain review of a decision by the

16   Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff Social Security

17   disability benefits and supplemental security income ("SSI").  Now before the Court are Plaintiff's

18   Motion for Summary Judgment or Remand ("Motion"), Defendant's Cross-Motion for Summary

19   Judgment ("Cross-Motion") and Plaintiff's Reply ("Reply").

20                                   **BACKGROUND**

21   **A.     Procedural History**

22         Plaintiff applied for supplemental security income ("SSI") benefits pursuant to Title XVI of

23   the Social Security Act ("the Act") on September 10, 2003, claiming a disability that began on

24   August 11, 2003.  (Tr. 75-77.)  Plaintiff alleged mental illness that prevented him from working.

25   Plaintiff's claim was denied initially and on reconsideration.  (Tr. 29-38.)  A request for a hearing

26   was timely filed on May 11, 2004.  (Tr. 39.)

27         A hearing was held before an Administrative Law Judge ("ALJ") on March 8, 2005 in

28   Oakland, California.  Plaintiff appeared with counsel and testified.  (Tr. 280-314.)  On June 1, 2005,

United States District Court
For the Northern District of California

the ALJ concluded that Plaintiff is not under a "disability," as the term is defined in the Social Security Act and Regulations. ( Tr. 16.)  The ALJ found that "[s]ince claimant has only non-exertional limitations, the Medical-Vocational rules do not apply in this case." (Tr. 22.)  A Vocational Expert (VE) testified that "there are a significant number of jobs in the national economy that can be performed by a hypothetical individual with the claimant's vocational profile and a residual functional capacity." (*Id.*)  The ALJ concluded that considering the claimant's age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy. (Tr. 23.)

Plaintiff filed a request for review by the Appeals Council on July 13, 2005. (Tr. 12.)  On November 18, 2005, the Appeals Council denied review, and noted that the denial meant that the decision of the ALJ was a final decision of the Commissioner of Social Security. (Tr. 5-8.)  Plaintiff then filed for review in this Court on January 18, 2006. [Docket No. 1.]

On May 31, 2006, Plaintiff filed his Motion for Summary Judgment or Remand. [Docket No. 7.]  On July 31, 2006, Defendant filed its Opposition to Plaintiff's Motion and filed a Cross-Motion for Summary Judgment. [Docket No. 12.]  On August 29, 2006, Plaintiff filed his Reply Memorandum. [Docket No. 16.]

**B.    Factual Background**

**1.    Plaintiff's Disability Claim**

In his pre-hearing brief filed on May 31, 2006, Plaintiff alleged that he is disabled and unable to work by reason of mental illness.  Plaintiff's first contention was that his disability derives from his mild mental retardation coupled with another physical or mental impairment, imposing an additional and significant work-related impairment under Listing 12.05(C).  Plaintiff alleges in the alternative that he is also disabled and unable to work as a result of his psychotic disorder, mood disorder, and/or schizophrenia, pursuant to Listing 12.03.

**2.    Plaintiff's Testimony**

At the hearing, Plaintiff testified regarding his mental illness, specifically stating that he hears voices, has evil thoughts, and feels depressed.  He explained that he has been hearing voices since he was 17. (Tr. 290.)  Plaintiff also discussed his suicide attempts, once inside the California Youth

2

1  Authority ("CYA") which was prevented by a guard during an inmate count, and once at home which

2  was prevented by his father who discovered him in the garage with a knife. (Tr. 298.)

3      **3.    Medical Evidence**

4          Plaintiff is a 26 year-old male with a history of incarceration as a juvenile with extensive

5  psychiatric treatment and evaluation by the CYA. (Motion at 2.)  Plaintiff first became involved

6  with the criminal justice system at age 13 when he was arrested for theft. (Tr. 156.)  He was

7  committed to CYA in 1997 for violation of Penal Code § 487(c), grand theft from a person. (Tr.

8  156.)  Plaintiff was released in October 1999, but his parole was revoked and he returned to CYA in

9  March 2000. (Tr. 145.)  After showing aberrant behavior in custody, Plaintiff was transferred to the

10  intensive treatment program on July 5, 2001. (Tr. 153.)  He was transferred to another facility in

11  May 2002, to attend treatment groups and to gain some trade experience. (*Id.*)  Plaintiff's actual

12  commitment time expired on April 5, 2005. (*Id.*)

13      **a.    Evaluations by the California Youth Authority during Commitment**

14          On October 23, 2002, Purna C. Datta, Ph.D., performed a psychological evacuation at the

15  request of the Plaintiff's parole officer from the State of California Department of the Youth

16  Authority. (Tr. 152-160.)  Dr. Datta's assessment included: 1) review of Plaintiff's field file; 2)

17  review of behavioral reports; 3) clinical interview; 4) direct observation of behavior; 5) Mental

18  Status Examination; 6) Rey-15 Memory Test; 7) Bender Gestalt Visual Motor Test ("BGVMT"); 8)

19  Shipley Institute of Living Scale ("SILS"); 9) Carlson Psychological Survey ("CPS"); and 10)

20  Projective drawings of the House-Tree-Person Test. (Tr. 157.)

21          In his review of the field files and behavioral reports, Dr. Datta outlined all of the evaluations

22  performed on the Plaintiff while in the CYA.

23      1.    On February 5, 1998, Plaintiff was evaluated by Sharon Winter, Ph.D. at the Northern

24          Youth Correctional Reception Center Clinic, ("NYCRCC"), using Minnesota

25          Multiphasic personality Inventory ("MMPI"), Carlson Psychological Survey, ("CPS"),

26          Projective Drawings of House-Tree-Person, and Bender Visual Motor Gestalt Test.

27          Plaintiff was diagnosed with Conduct Disorder, onset unknown, Alcohol Abuse,

28          Cannabis Abuse, and Developing Antisocial tendencies. (Tr. 153.)

United States District Court
For the Northern District of California

3

2.   On February 18, 1999, Bert Kopell, M.D., Training Consultant in psychiatry at Karl Holton Youth Correctional Facility ("KHYCF"), evaluated Plaintiff and diagnosed him with Conduct Disorder and Alcohol Abuse. Dr. Holton thought Plaintiff's intelligence was in the dull-normal range and showed no signs of thought disorder, depression or anxiety and suggested psychotherapy or pharmacotherapy. (Tr. 154.)

3.   On December 21, 2000, Plaintiff was again evaluated by Sharon Winter, Ph.D. at NYCRCC using Adolescent Multiphasic personality Inventory ("AMPI"), Million Clinical Multiaxial Inventory-III ("MCMI-III"), CPS, and Projective Drawings of the House-Tree-Person. Dr. Winter noted regression since she last saw him, and diagnosed Plaintiff with Adjustment Disorder with mixed anxiety and depressed mood, Schizoid Personality (rule out Schizotypal Personality) Disorder, and assigned him a GAF[1] of 35 (needing intensive treatment program). (*Id.*)

4.   On June 14, 2001, Plaintiff was evaluated by Purna C. Datta, Ph.D. at DeWitt Nelson Youth Correctional Facility ("DWNYCF") resulting from Plaintiff's bizarre behavior of smearing feces in the lockup room, as well as other acts and "suicidal behavior." Plaintiff admitting this behavior was his "primitive way" of getting attention. Dr. Datta diagnosed Plaintiff with Cyclothymic Disorder, Alcohol Abuse, Attention-Deficit/Hyperactivity Disorder (hyperactive-impulsive type), Conduct Disorder, adolescent onset, solitary aggressive type (now turning into antisocial personality disorder), Personality Disorder NOS ("Not Otherwise Specified"), with mixed borderline, Schizoid, paranoid and antisocial features, and assigned a GAF of 55. (Tr. 155.)

In his clinical interview, Dr. Datta observed that Plaintiff was polite and cooperative. There were no symptoms of a thought disorder or of active psychotic processes, but his abstract thinking

---

[1] The GAF Scale is a 100-point single-item rating scale for evaluating overall psychosocial functioning during a specified time period on a continuum from psychological sickness to health. The GAF scale values range from 1 to 100, representing the hypothetically sickest person to the hypothetically healthiest. The scale is divided into 10 equal 10-point intervals. Spitzer, R. L., Gibbon, M., Williams, J., & Endicott, J. (1996), *Global Assessment of Functioning (GAF) Scale*. In L. I. Sederer & B. Dickey (Eds.), *Outcomes assessment in clinical practice*, 76-78.

1   and attention to tasks were sub-average.  Plaintiff had good eye contract and his speech was clear and

2   easily understandable.  He did not appear to be suffering from significant symptoms of depression or

3   anxiety.  His thought processes were organized and coherent.  His affect was appropriate and he

4   appeared to be in control of his thoughts and feelings.  His memory for short term and long term

5   information appeared to be intact.  (Tr. 157.)

6          On the Rey-15 Memory Test, Plaintiff received a perfect score of 15/15, indicating average

7   immediate memory and lack of effort to malinger symptoms of psychopathology.  (Tr. 157-58.)  On

8   the Bender Gestalt Visual Motor Test, Plaintiff received a score of 2, indicating average visual motor

9   skills.  (Tr. 158.)  On the Shipley Institute of Living Scale, to assess his estimated verbal intelligence,

10  Plaintiff received a T-score of 31 on the Verbal subtest and a T-score of 38 on the Abstract

11  Reasoning subtest, and his estimated full-scale I.Q. equivalent was 75, placing him in the borderline

12  range of intellectual functioning.  (*Id.*)

13         Plaintiff was evaluated using two personality measures – the Carlson Psychological Survey

14  and the Projective Drawings of House-Tree-Person Test.  The CPS generated a personality profile of

15  Type 9.  The Projective Drawings of House-Tree-Person Test indicated Plaintiff's poor cognitive

16  abilities but did not indicate the presence of any serious psychopathology.  (*Id.*)

17         In his DSM-IV-TR[2] Diagnosis, Dr. Datta concluded:

18  Axis I:          301.13        Cyclothymic Disorder (mild form and in remission)

19                   314.01        Attention-Deficit/Hyperactivity Disorder
20                                 (Hyperactive/Impulsive Type)

21                   312.8         Conduct Disorder, adolescent onset, solitary aggressive
                                   type (now in remission as he is taking responsibility)

22                   305.00        Alcohol Abuse (institutional abstinence)

23                   305.2         Cannabis Disorder, by history

24  Axis II:         310.9         Personality Disorder NOS, with mixed schizoid,
25                                 borderline, paranoid and antisocial features

26

27         [2] Diagnostic and Statistical Manual of Mental Disorders, Text Revision, Fourth Edition, May
28  2000.

United States District Court
For the Northern District of California

5

1  Axis III.                   No Diagnosis on Axis III

2  Axis IV:                    Psychosocial stressors: Mild related to paroling to his parents

3  Axis V:                     Current GAF = 74

4  (Tr. 159.)

5         Dr. Datta strongly recommended that Plaintiff see a licenced psychiatrist and undergo

6  psychotherapy, as well as aftercare counseling/family therapy to address his issues of abandonment

7  and rejection. Dr. Datta also felt that Plaintiff may benefit from medication during his transition time

8  to the community.  (Tr. 160.)

9                  **b.**      **Evaluations After SSI Claim was Filed on September 10, 2003.**

10                 **i.**       **Marinos Evaluation**

11        On December 18, 2003, Janine Marinos, Ph.D. of the Bayview Medical Clinic in Richmond,

12 California, performed a psychological evaluation to aid in the assessment of Plaintiff's disability and

13 to provide diagnostic impressions to the Social Security Administration.  When asked about his

14 disability, Plaintiff reported hearing voices and seeing demons.  He said, "I can't live a normal life

15 like other people because I am different and odd and strange to others and myself."  (Tr. 163.)

16        Dr. Marinos' assessment included: 1) review of the psychological evaluation conducted on

17 October 23, 2002; 2) review of previous evaluations; 3) pre-test clinical interview; 4) direct

18 observation of behavior; 5) Mental Status Examination; 6) Wechsler Adult Intelligence Scale-III

19 ("WAIS-III"); 7) Wechsler Memory Scale-III ("WMS-III") Logical Memory I/II, Faces I/II; 8) Bender

20 Gestalt Test; and 9) Rey-15 Memory Test.  (Tr. 162.)

21        Dr. Marinos noted in the report that Plaintiff was generally cooperative, but his level of effort

22 on testing was questionable.  As a consequence, the results of the evaluation may underestimate his

23 true cognitive abilities.  (Tr. 164.)

24        On the WAIS-III IQ's, Plaintiff achieved a 70 IQ on verbal, a 74 IQ on performance, and a

25 full-scale IQ of 69.  This evaluation was limited in scope and based on a single, time-limited session

26 with Plaintiff.  Dr. Marinos made the following diagnosis:

27 Axis I:                     Deferred

28 Axis II:                    Antisocial Traits

*United States District Court*
*For the Northern District of California*

1          Rule out Borderline Intellectual Functioning

2   Axis III:                    No Diagnosis

3          Dr. Marinos stated that her diagnosis in this case was unclear. However, she opined that

4   Plaintiff's complaints of vague auditory hallucinations and seeing demons were not indicative of the

5   presence of an overt psychotic disorder. Based solely on the current evaluation and from a strictly

6   cognitive and emotional standpoint, Plaintiff appeared to understand, remember and carry out simple

7   instructions and to maintain adequate concentration, persistence, or pace for simple tasks. He

8   seemed to have the capacity to respond appropriately to others. (Tr. 165-66.)

9                    **ii.      Contra Costa County Mental Health Clinic**

10         Plaintiff was treated by the Contra Costa County Mental Health Clinic from December 31,

11  2002, to February 25, 2004, where his primary complaints were hearing voices and being depressed.

12  Plaintiff's last evaluation on February 25, 2004, the progress note indicates a diagnosis of psychotic

13  disorder with Post Traumatic Stress Disorder ("PTSD"). Plaintiff reported having flashbacks from

14  when he was incarcerated. This evaluation indicated that Plaintiff was stabilized on medication.

15  (Tr. 169-70.)

16                   **iii.     Mental Residual Functional Capacity Assessment on Jan. 14, 2004**

17         A Mental Residual Functional Capacity Assessment (Form SSA-4734-F4-Sup), dated

18  January 14, 2004, conducted by Ida Hilliard, M.D. from the Disability Determination Services

19  ("DDS"), concluded that Plaintiff is Not Significantly Limited in any category. Dr. Hilliard

20  concluded that Plaintiff is Moderately Limited in: 1) the ability to understand and remember detailed

21  instructions; 2) the ability to maintain attention and concentration for extended periods; 3) the ability

22  to interact appropriately with the general public; and 4) the ability to get along with coworkers or

23  peers without distracting them or exhibiting behavioral extremes. (Tr. 177-82. )

24         Dr. Hilliard concluded that Plaintiff had been diagnosed with Borderline intellectual

25  functioning, and Personality disorder, NOS. However, she felt that Plaintiff is capable of performing

26  simple, repetitive tasks on a sustained and independent basis, with limited contact with others. (Tr.

27  182.)

28                   **iv.      Psychiatric Review Technique on April 29, 2004**

**United States District Court**
**For the Northern District of California**

7

United States District Court
For the Northern District of California

1    A Psychiatric Review Technique (Form  SSA-2506-BK), dated April 29, 2004, was

2    conducted by Robert Y. Hood M.D., Psychiatric Consultant for the DDS.  Dr. Hood concluded that

3    Plaintiff has borderline intellectual functioning, a personality disorder NOS, with antisocial traits,

4    mental impairments that cause Plaintiff to have mild restriction of activities of daily living, moderate

5    difficulties in maintaining social functioning, moderate difficulties in maintaining concentration,

6    persistence, or pace.  Dr. Hood noted that there is no evidence of any episodes of decompensation.

7    (Tr. 187-200.)

8                          **v.      Correspondence from James R. Stueland, MFT, on Jan. 5, 2004**

9        In a correspondence dated January 5, 2004, James R. Stueland, MFT (Marriage Family

10   Therapist), stated that since he has been Plaintiff's therapist and counselor since October 23, 2003,

11   Plaintiff has shown improvement in his behavior and mental state. He is compliant with medications

12   for depression.  Plaintiff reported no drug usage.  Plaintiff informed Mr. Stueland that his goal was

13   to become a certified nurse assistant.  (Tr. 206-07.)

14                          **vi.     Psychiatric Vocational Evaluation on May, 19, 2004**

15       On May 19, 2004, Stephen A. Levine, M.D. performed a psychiatric evaluation at the request

16   of the Department of Rehabilitation.  During the interview, Plaintiff reported being a "slow learner,"

17   but was never diagnosed with a learning disorder.  (Tr. 210.)  Plaintiff had a history of special

18   education classes and tutors, but was asked to repeat a year.  Plaintiff graduated from high school.

19   (Tr. 209.)

20       On the mental status examination, Dr. Levine reported that Plaintiff was "oriented to person,

21   place, and time." (Tr. 210.)  Furthermore, "his memory was intact for immediate, recent, and remote

22   material. He recalled three items after ten minutes. He was able to complete simple calculations in

23   his head, his fund of general information was adequate, and he hd no apparent difficulty paying

24   attention or concentrating." (*Id.*)  Dr. Levine estimated Plaintiff's IQ to be in the low average range.

25   (*Id.*)

26       Dr. Levine made the following diagnosis:

27   Axis I:              296.9        Mood Disorder NOS

28   Axis II:             799.90       Diagnosis Deferred, (Obsessive-Compulsive Traits)

| | |
|---|---|
| Axis III: | No Diagnosis |
| Axis IV: | Unemployment |
| Axis V: | GAF 50 |

In conclusion, Dr. Levine stated that because one of Plaintiff's brothers has been diagnosed with Schizophrenia, he was suspicious about the possibility that Plaintiff also may have the disorder. However, Dr. Levine did not see any clear signs of Schizophrenia. (Tr. 210-11).

### vii.    Psychological Evaluation on June 17, 2004

On June 17, 2004, licensed psychologist V.L. Sternitzke, Ed.D., performed a psychological evaluation on behalf of the California Department of Rehabilitation. Dr. Sternitzke's evaluation included: 1)Wechsler Adult Intelligence Scale-III ("WAIS-III"); 2) Bender Motor Gestalt Test; 3) Wide Range Achievement Test; 4) Nelson-Denny Reading Test; and 5) Minimult, a truncated form of the Minnesota Multiphasic Personality Inventory ("MMPI"). (Tr. 212-15.)

Dr. Sternitzke noted in his report that Plaintiff was generally cooperative and no testing impairments were in evidence. "No practice effect on this test was detected." (Tr. 213.) On the WAIS-III IQ's, Plaintiff achieved a verbal IQ score of 74, a performance IQ score of 77, and a full-scale IQ of 72. Two new scales were offered on the WAIS-III, verbal comprehension at 74, and perceptual organization at 80. (*Id.*)

On the Wide Range Achievement Test, the results indicated normal achievement in reading and arithmetic, underachievement in no subjects, and some overachievement in spelling. (Tr. 214).

Dr. Sternitzke made the following diagnosis:

| | | |
|---|---|---|
| Axis I: | 315.2 | Disorder of Written Expression, Mild |
| | 315.1 | Mathematics Disorder, Mild |
| | 315.9 | Learning Disorder NOS, Mild Memory and Gestalt Dysfunction |
| | 315.4 | Development Coordination Disorder, Mild |
| | 295.30 | Schizophrenia, Paranoid Type, Severe |
| Axis II: | V62.89 | Borderline Intellectual Functioning |

(*Id.*)

United States District Court
For the Northern District of California

**viii.    Contra Costa Mental Health Treatment Notes from December 5, 2003 to January 31, 2005.**

Medical records from the Contra Costa Health Services encompass treatment from December 5, 2003, to January 31, 2005, primarily for depression and hemorrhoids.  A September 3, 2004, progress note states that Plaintiff is "motivated for change and setting goals." (Tr. 217.)  Another progress note dated December 3, 2005, states that Plaintiff's depression was well controlled by Prozac.  (Tr. 254.)

### 4.    Vocational Expert's Testimony

The VE was asked by the ALJ to assess what jobs exist for a hypothetical individual in Plaintiff's situation, namely 24 years of age, with a high school diploma and a full-scale IQ of 72, and the specific learning disabilities found by Dr. Sternitzke on June 17, 2004.  The ALJ further stated that the hypothetical individual is limited to the performance of simple repetitive tasks, that is, he is able to understand, remember, and carry out three step instructions.  The individual is further limited by his slight difficulties in interacting with co-workers, moderate difficulties in interacting with supervisors, and is precluded from working with the general public.  (Tr. 309.)

The VE testified that the hypothetical individual could perform the tasks necessary as a cleaner, as this type of work is isolated from the public and a supervisor need only give the instructions at the beginning of the shift.  (*Id.*)  Additionally, a cleaner works alone and potential co-worker interaction is eliminated.  (Tr. 310.)

### B.    Summary of ALJ's Findings

After consideration of the entire record, the ALJ made the following findings regarding the Plaintiff's alleged disability:

1.    The claimant has not engaged in substantial gainful activity since August 11, 2003.

2.    The claimant has borderline intellectual functioning, and a personality disorder not otherwise specified with antisocial traits, a combination of mental impairments considered "severe" based on the requirements in the

Regulations 20 C.F.R. § 416.920(c).[3]

3.    The medically determinable mental impairments, either singly or in
      combination, do not meet or medically equal one of the listed impairments in
      Appendix 1, Subpart P, Regulation No. 4.

4.    The claimant's allegations regarding his limitation are not entirely credible.

5.    The claimant retains the residual functional capacity to perform simple and
      repetitive tasks. He has slight difficulties in interacting appropriately with co-
      workers, moderate difficulties in interacting appropriately with supervisors
      and cannot be closely supervised, he is precluded from working with the
      general public, and he has moderate limitations in maintaining attention and
      concentration for extended periods.

6.    The claimant has no past relevant work (20 C.F.R. § 416.965).

7.    The claimant is currently a younger individual (20 C.F.R. § 416.963).

8.    The claimant has a high school education (20 C.F.R. § 416.964).

9.    Based on the testimony of the vocational expert, and considering the
      claimant's age, education, work background, and residual functional capacity,
      there are a significant number of jobs in the national economy that Plaintiff
      could  perform. Examples of such jobs include work as a cleaner. Plaintiff is
      therefore not disabled.

10.   The claimant was not under a "disability" as defined in the Social Security
      Act, at any time through the date of this decision (20 C.F.R. § 416.920(f)).

(Tr. 23-24.)

      Accordingly, the ALJ concluded that Plaintiff was not disabled, and therefore he was
ineligible for Social Security disability benefits and SSI.

---

[3]The Court recognizes the typographical error in the ALJ's findings where the ALJ cites 20
C.F.R. §416.920(b) instead of the correct citation, §416.920(c).

**LEGAL STANDARD**

This Court's jurisdiction is limited to determining whether the Social Security Administration's denial of benefits is supported by substantial evidence in the administrative record. 42 U.S.C. § 405(g).  A district court may overturn a decision to deny benefits only if it is not supported by substantial evidence, or if the decision is based on legal error.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The Ninth Circuit defines substantial evidence as "more than a scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039.  The Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence.  *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998).  Rather, the court must "consider the record as a whole, weighing both the evidence that supports and evidence that detracts" from the Commissioner's conclusion.  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001).  Where the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld. *Andrews*, 53 F.3d at 1041.

**DISCUSSION**

Plaintiff claims that the ALJ "failed to follow the requirements of the Social Security Act" and that the decision is not supported by substantial evidence. (Motion at 1.)  Plaintiff argues that the ALJ erred as follows: 1) the ALJ failed to provide any explanation for his determination that the claimant did not meet or equal Listings 12.05(C) and 12.03; 2) the ALJ did not provide specific legitimate reasons based on substantial evidence in the record for rejecting the opinion of the treating psychiatrist; 3) the ALJ did not provide an adequate reason for rejecting Dr. Sternitzke's opinion; and 4) the ALJ did not provide any specific reasons for disbelieving Plaintiff's testimony.  (*Id.*, 6-20.) Defendant responds that the ALJ's decision is supported by substantial evidence and free of legal error.  (Cross-Motion at 1.)  Defendant contends that: 1) Plaintiff did not meet listings 12.05(C) and 12.03; 2) the commissioner properly discounted the physicians' opinions; and 3) the ALJ properly assessed Plaintiff's credibility. (*Id.*, 2-10.)

In considering whether a claimant is entitled to benefits, an ALJ conducts a five-step

12

1    sequential inquiry. 20 C.F.R. § 416.920.[4] At the first step, the ALJ considers whether the claimant is

2    engaged in substantial gainful activity.  If the claimant is not engaged in substantial gainful activity,

3    the ALJ moves on to the second step and considers whether the claimant has a severe impairment

4    (i.e. an impairment that has a significant effect on the claimant's ability to function).  If the claimant

5    has a severe impairment, the third step asks whether the claimant has a condition which meets or

6    equals the conditions outlined in the Listings of Impairments in Appendix 1 of the Regulations (the

7    "Listings").  If the claimant does not have such a condition, the fourth step asks whether the claimant

8    is capable of performing his past relevant work.  If the claimant is not capable of performing past

9    relevant work, the fifth step asks whether the claimant is capable of performing other work which

10   exists in substantial numbers in the national economy.  20 C.F.R. § 404.1520(b)-404.1520(f)(1).

11        In this case, the ALJ found that Plaintiff has not engaged in significant gainful activity since

12   August 11, 2003, and at step two, the ALJ found that Plaintiff's "impairments, in combination, are

13   'severe,' i.e., they more than minimally affect the claimant's ability to perform basic work activities."

14   (Tr. 17.)  However, at step three, the ALJ held that Plaintiff's impairments did not meet or equal any

15   of the listed impairments in Appendix 1.  (*Id.*)

16        The parties' arguments focus on three questions: 1) whether the ALJ properly determined

17   Plaintiff's combined impairments did not meet or equal a listed requirement, 2) whether the ALJ

18   properly discredited the opinions of Plaintiff's treating and examining physicians, and 3) whether

19   Plaintiff's testimony was properly rejected.

20   **A.    Whether substantial evidence exists to support the ALJ's finding that Plaintiff's**

21   **Combined Impairments do not meet or equal a Listed Impairment.**

22        Plaintiff claims that the ALJ failed to provide substantial evidence that Plaintiff's combined

23   impairments did not meet or equal one of the listed impairments.  Specifically, Plaintiff asserts that

24   the ALJ did not address Listing 12.05(C) or 12.03. (Motion at 10.)  Plaintiff also argues that the ALJ

25

26   ────────────────────

     [4]The Social Security Regulations set out a five-step sequential process for determining whether
     a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520.  The
27   burden of proof is on the claimant as to steps one to four.  At step five, the burden shifts to the
     Commissioner.  If a claimant is found to be "disabled" or "not disabled" at any step in the sequence,
28   there is no need to consider subsequent steps.

United States District Court
For the Northern District of California

did not provide a "logical, fact-based explanation for why the claimant was not found to meet or equal Listings 12.05C or 12.03." (Reply at 2.)

Substantial evidence is more than a scintilla, but less than a preponderance. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). To meet a listed impairment, a claimant must show that he satisfies each characteristic of a listed impairment relevant to her claim and must have every element specified in the listing. *See Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995) (per curiam). An ALJ must first address whether a Plaintiff's symptoms meet the requirements of the listings. 20 C.F.R. § 404.1526. If a Plaintiff does not meet the required elements, the ALJ must still find a disability if the impairments are medically equivalent to those required in the listing. *Id.* If the ALJ finds that the "symptoms, signs, and laboratory findings" are at least equal in severity and duration to the medical criteria in the listed impairment, then equivalence is established. *Id.* The medical equivalence finding is based on submitted medical evidence along with the opinion of appointed medical consultants. *Id.*

Once a determination is made, the ALJ must detail the equivalency analysis in the decision. *See Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). "A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not [meet or equal a listed impairment]." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). This does not mean, however, that the ALJ must "state why a claimant failed to satisfy every different section of the listing of impairments." *Gonzales v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). The ALJ's decision must be "as comprehensive and analytical as feasible," and when appropriate the ALJ should include "a statement of the subordinate factual foundations which the ultimate factual conclusions are based." *Id.*

### 1. 12.05(C)

Plaintiff contends that he has made a *prima facie* showing under listing 12.05(C). Under listing 12.05(C), a claimant must show two things: first, the claimant must have a valid verbal, performance, or full-scale IQ score of sixty to seventy; and second, the claimant must have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404 subpt. P, app. 1, § 12.05(C).

Plaintiff claims he meets the first prong of 12.05(C) because two separate IQ tests yielded a

14

United States District Court
For the Northern District of California

1   valid full-scale IQ score of sixty to seventy (where the second IQ test is adjusted to reflect the

2   "practice effect"). (Motion at 7.) Defendant counters that Plaintiff was not diagnosed with mental

3   retardation, but rather with borderline intellectual functioning. (Cross-motion at 2.) Plaintiff

4   responds that requiring an actual diagnosis of mental retardation is not mandated by the Regulations

5   and that Defendant is barred from raising new arguments on appeal. (Reply at 3, n.2.)

6       Reading the introduction to the mental disorder impairment listings reveals that an actual

7   diagnosis of mental retardation is not required. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00(A).

8   "If your impairment satisfies the diagnostic description in the introductory paragraph and any one of

9   the four sets of criteria, [the Commissioner] will find that your impairment meets the listing." *Id.*  In

10  regards to 12.05(C), the regulations clearly state "[f]or paragraph C, we will assess the degree of

11  functional limitation the additional impairment(s) imposes to determine if it significantly limits your

12  physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in

13  §§ 404.1520(c) and 416.920(c)." *Id.*  There is no mention of requiring an actual diagnosis of mental

14  retardation.  Admittedly, the ALJ found that the claimant's combination of mental impairments is

15  considered "severe." (Tr. 23-24.) [5]  Thus, no dispute exists as to whether the ALJ found the requisite

16  degree of impairment. The question remains whether the impairment is a significant work-related

17  functional limitation.

18      The Court finds substantial evidence to support the finding that the first prong of the two part

19  12.05(C) analysis was not met.  The first prong requires the claimant to have a valid verbal,

20  performance, or full-scale IQ score of sixty to seventy. 20 C.F.R. pt. 404 subpt. P, app. 1, §12.05(C).

21  Plaintiff argues that two full scale IQ scores in the sixty to seventy range are in the record: the first

22  full-scale IQ score of sixty-nine received on December 18, 2003 and the second full-scale IQ score of

23  sixty-seven (after subtracting five points from the original score of seventy-two)[6] received on June

---

25      [5]*See* text *supra* accompanying note 3.

26      [6]*See* Social Security Administration's Programs Operations Manual System ("POMS"), Section
27  DI, 24515.055(C) Evaluation of Specific Issues Psychological / Psychometric Testing, *available at*
    https://s044a90.ssa.gov/apps10/poms.nsf/lnx/0424515055!opendocument. (describing a "practice effect"
28  where it is reasonable to see an increase in IQ scores of five points when administering the same test
    within six months of each administration.)

United States District Court
For the Northern District of California

30, 2004. (Motion at 7.)   While this may be a rational interpretation, this Court must uphold the ALJ's conclusion where the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F.3d at 1041.  Notably, Dr. Marinos reported that the claimant's level of effort on the IQ test given on December 18, 2003 was questionable and may underestimate Plaintiff's true cognitive abilities. (Tr. 164.)  Further, the second IQ score is in the borderline intellectual functioning range as diagnosed by Dr. Sternitzke.  Drs. Datta, Hillard, and Hood estimated the same diagnosis prior to this second IQ test. (Tr. 158, 27-28, and 188.)  Moreover, Dr. Sternitzke detected no "practice effect" on the second administration of the IQ test. (Tr. 213.)  In light of the medical evidence which questions the validity of the first full-scale IQ score and that the second score was not tainted by the "practice effect," the ALJ had substantial evidence to support his conclusion that the first prong was not met.

However, Plaintiff also fails to prove the second prong of Listing 12.05(C). The second prong is defined in *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987) as a significant work-related impairment whose effect on a claimant's ability is more than slight or minimal.  Plaintiff asserts that the Vocational Expert's response to the ALJ's hypothetical shows substantial limitations on Plaintiff's ability to work.  The limitations included: 1) slight impairment on coworker interaction, 2) impairment precluding close supervision, and 3) a total preclusion from working with the public.  Plaintiff fails to show how the impairment is more than slight or minimal because those limitations are easily accommodated in the job suggested by the Vocational Expert (a cleaner).  The ALJ noted the lack of evidence from the medical records that the claimant is unable to work due to mental illness. (Tr. 21.)  Even the claimant believes he can work, as evidenced by his desire to become a certified nurse assistant. (*Id.*)  Further, the claimant's counselor and therapist, Mr. Stueland, suggested that this was not an over-reaching goal for the claimant. (*Id.*)  Lastly, the ALJ considered the fact that no mental health profession of record has rendered an opinion that the claimant is unable to work due to his mental condition. (*Id.*)  Plaintiff relies heavily on the diagnoses of Drs. Marinos, Levine, Sternitzke, and Shah to argue that Plaintiff has a long history of mental illness. (Motion at 8.)  However, this medical record fails to indicate to the Court how Plaintiff is rendered unable to work as a result of his "characterological disorder." (*Id.*)  Thus, substantial evidence exists in the record

United States District Court
For the Northern District of California

1    supporting the ALJ's conclusion that Plaintiff's combination of impairments did not constitute a

2    significant work-related impairment.

3        Plaintiff argues further that the ALJ had an affirmative duty to explain why Plaintiff's

4    impairments, when viewed in combination, did not equal a listed impairment.  This argument is

5    unavailing.  Plaintiff has presented no alternative test results to demonstrate equivalence, *see Marcia*

6    *v. Sullivan*, 900 F.2d at 176, and has offered "no theory, plausible or otherwise, as to how [his

7    impairments] combined to equal a listed impairment." *Lewis*, 236 F.3d at 514.  Because it is

8    unnecessary for an ALJ to state why a claimant failed to satisfy every section of a listing, *see*

9    *Gonzalez*, 914 F.2d at 1200-01, the ALJ was not required to state explicitly why Plaintiff did not

10   equal this particular listing.

11       Even if the Plaintiff had presented alternative test results, the ALJ adequately explained his

12   reasoning in finding that Plaintiff's combined impairments did not equal the 12.05(C) listing.  "[I]n

13   determining whether a claimant equals a listing under step three of the Secretary's disability

14   evaluation process, the ALJ must explain adequately his evaluation of alternative tests and the

15   combined effects of the impairment."[7]  *Marcia*, 900 F.2d at 176.  Here, the ALJ evaluated the

16   claimant's allegations regarding inability to work and found them not entirely credible.  (Tr. 22.)  The

17   ALJ stated in his decision, "[w]hile the claimant's mental impairments are severe, the objective

18   medical evidence substantiates he remains able to work." (Tr. 21.)  Thus, the ALJ adequately

19   explained his consideration of the tests and combined effects of the impairment in determining

20   equivalence for the 12.05(C) Listing.

21       Therefore, this Court finds substantial evidence to support the ALJ's finding that Plaintiff did

22   not meet or equal Listing 12.05(C).

23       *2. 12.03*

24       Plaintiff argues that his condition meets or equals Listing 12.03.  The required level of

25   severity for this listing is met by satisfying parts A and B, or, in the alternative, part C of Listing

26

27       [7] The ALJ has wide discretion in where this analysis occurs in the opinion. *See Lewis*, 236 F.3d

28   at 513 ("*Marcia* simply requires an ALJ to discuss and evaluate the evidence that supports his or her
     conclusion; it does not specify that the ALJ must do so under the heading Finding.").

1   12.03.  20 C.F.R. pt. 404, subpt. P, app. 1, §12.03.  Listing 12.03 requires a showing of either:

2

3   A.  Medically documented persistence, either continuous or intermittent, of one or more of the
following:

4           1.      Delusions or hallucinations; or
           2.      Catatonic or other grossly disorganized behavior; or

5           3.      Incoherence, loosening of associations, illogical thinking, or poverty of content of
                  speech if associated with one of the following:

6                  a.      Blunt affect; or
                  b.      Flat affect; or

7                  c.      Inappropriate affect; or
           4.      Emotional withdrawal and/or isolation;

8   and

9   B. Resulting in at least two of the following:
           1.      Marked restriction of activities of daily living; or

10          2.      Marked difficulties in maintaining social functioning; or
          3.      Marked difficulties in maintaining concentration, persistence, or pace; or

11          4.      Repeated episodes of decompensation, each of extended duration;
   or

12   C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic
disorder of at least 2 years duration that has caused more than a minimal limitation of ability to

13   do basic work activities, with symptoms or signs currently attenuated by medication or
psychosocial support, and one of the following:

14          1.      Repeated episodes of decompensation, each of extended duration; or
          2.      A residual disease process that has resulted in such marginal adjustment that even

15                 a minimal increase in mental demands or change in the environment would be
                 predicted to cause the individual to decompensate; or

16          3.      Current history of 1 or more years inability to function outside a highly supportive
                 living arrangement, with an indication of continued need for such an arrangement.

17   *Id.*

18        Here, the Plaintiff argues that he meets the requirements of parts A and B.  Plaintiff alleges

19   that the Part A requirement is met by the medically documented persistence, either continuous or

20   intermittent, of auditory hallucinations.  (Motion at 12.)  Plaintiff relies on the his own testimony to

21   his treating physician, Contra Costa Health Services.  (*Id.*)  Defendant counters that non-treating

22   physicians have found no evidence of "active psychotic processes" on examination and "no

23   indication . . . of an overt psychotic disorder." (Cross-Motion at 4-5 (citing Tr. 157 and 165).)

24   Assuming that Part A is met and that Plaintiff has medically documented persistence of auditory

25   hallucinations, substantial evidence still exists to support the ALJ's conclusion.  Plaintiff's

26   impairment does not meet 12.03 because Plaintiff fails to show the requirements of Part B have been

27   satisfied.

28        Plaintiff must meet two of four criteria to satisfy part B of Listing 12.03.  These criteria

United States District Court
For the Northern District of California

include: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.03(B). Although Plaintiff urges the Court that the record shows Plaintiff's marked difficulties in maintaining social function and marked impairment of concentration, the Court disagrees. The "marked" level of severity means more than moderate, but less than extreme. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00(C). Further, in the context of maintaining social function and impairment of concentration, a marked limitation may arise when one or several activities or functions are impaired as long as the degree of limitation seriously interferes with a claimant's ability to function independently, appropriately, effectively, and on a sustained basis. *Id.*

Plaintiff cites evaluations by Dr. Shah and his job mentor in proving marked difficulties in maintaining social function. (Motion at 12.) Impaired social functioning can be evidenced by a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00(C)(2). Conversely, strength in social functioning can be shown by the ability to initiate social contacts with others, communicate clearly with others, and interacting and actively participating in group activities. *Id.* Plaintiff points to Dr. Shah's evaluation which consists of check-boxes evaluating the claimant's ability to adjust to a job as well as claimant's job mentor description of violent verbal outbursts made by the claimant on several occasions. (Tr. 271 and 148.) However, the ALJ concluded that the claimant's mental impairments cause him to have "moderate difficulties in maintaining social functioning." (Tr. 22.) The ALJ concluded that claimant's ability to maintain a long-lasting steady relationship with his girlfriend, claimant's positive peers, and the fact that he willingly helps his grandmother around the house by doing light housekeeping, laundry, shopping, and preparing simple foods was not indicative of mental illness. (Tr. 21.) Thus, the Court finds substantial evidence to support the ALJ's finding that Plaintiff had "moderate" difficulties in maintaining social functioning.

The ALJ also properly concluded, in accordance with the Psychiatric Review Technique form, that Plaintiff's mental impairments cause him moderate difficulties in maintaining concentration. (Tr. 22.) Limitations in concentration, persistence, or pace are best observed in work

19

settings, but some major limitations can be assessed through clinical examination or psychological testing. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00(C)(3). In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00(C)(3). Plaintiff cites to only one document to prove his marked impairment of concentration. (Motion at 12.) Plaintiff cites to Dr. Shah's medical assessment on July 18, 2005 which consists of a checkmark in the "poor or none" category when asked to rate claimant's ability to maintain attention / concentration. (Tr. 271.) Because the ALJ discounted Dr. Shah's medical assessment (Tr. 20), Plaintiff fails to prove that he experienced "marked" difficulties in maintaining concentration.

Even if the Court gives full weight to this evidence, it pales in comparison to the amount of recorded clinical examinations in the medical record. Plaintiff has consistently performed well on intelligence tests in regards to concentration. (Tr. 157-58, 165-66, and 210.) The ALJ also cited a complete lack of evidence in the record that claimant is unable to work due to mental issues. (Tr. 21.) Moreover, Drs. Hillard and Hood opined that Plaintiff did not have any marked limitations in the "'B' criteria of the Listings," including concentration, persistence or pace. (Tr. 197.) Drs. Hillard and Hood also determined that Plaintiff did not have an impairment that satisfied listing 12.03. (Tr. 27-28, 187.) These determinations were uncontradicted and constituted substantial evidence upon which the ALJ could reasonably rely to conclude that Plaintiff's impairment did not meet or equal the 12.03 Listing.

Additionally, the ALJ noted that no mental health professional of record has rendered an opinion that the claimant is unable to work due to his mental condition. (*Id.*) Further, the claimant's job mentor declared that over a period of time the claimant may be able to be employed even though he has "thinking errors that sometimes prevent him from performing his work." (Tr. 148.) Based on the record, the Court finds substantial evidence to support the ALJ's finding that Plaintiff's impairments have caused him moderate difficulties in concentration in accordance with the Psychiatric Review Technique form.

As noted above, Plaintiff failed to provide alternative tests to prove that Plaintiff's combined impairments, when viewed as a whole, are equivalent to the 12.03 listing. The ALJ adequately

1  explained his evaluation of tests by stating his reliance on the objective medical evidence.  (Tr. 22.)

2  Thus, the Court finds substantial evidence to support the ALJ's finding that Plaintiff's impairments

3  do not meet or equal the 12.03 listing.

4        *3. Whether ALJ is under an affirmative duty to explicitly state his reasoning.*

5        Plaintiff contends that the ALJ's decision contained little more than a boilerplate statement,

6  and remand is necessary because the ALJ failed to address either Listing or provide a reasoned

7  determination as to whether Plaintiff meets or equals the presumptive definition of disability.

8  (Motion at 10-11.)

9        In *Gonzales*, the ALJ made a determination that the Claimant did not meet or equal a  listed

10  impairment. *Gonzales*, 914 F.2d at 1200.  The ALJ's decision was a five-page, single spaced

11  summary of the record, wherein the ALJ summarized the information given by each of the doctors

12  and appellant's testimony.  *Id.*  However, the ALJ did not state what evidence supported the

13  conclusion that appellant's impairments do not meet or equal the Listing of Impairments.  The

14  appellant argued that the Secretary committed error by failing to discuss why he did not satisfy the

15  Listing of Impairments.  *Id.*  The Ninth Circuit held that the ALJ's decision was an "adequate

16  statement of the foundations on which the ultimate factual conclusions are based" and affirmed.  *Id.*

17  (citations omitted).

18        Similarly in this case, the ALJ properly considered the combination of Plaintiff's impairments

19  when evaluating the application of the Listings, and his decision was supported by substantial

20  evidence.  The regulations only require the ALJ to "review the symptoms, signs, and laboratory

21  findings." 20 C.F.R. § 404.1526.  The ALJ in this case did so; the summary of the evidence as to

22  Plaintiff's mental impairments was quite thorough.  Thus, Plaintiff's argument is rejected because the

23  ALJ provided adequate reasoning for his findings.

24        In light of the objective medical evidence on which the ALJ relied, and given Plaintiff's lack

25  of alternative tests to prove equivalence, the Court finds that substantial evidence supports the ALJ's

26  conclusion that Plaintiff's combined impairments do not meet or equal a Listed Impairment.

27

28

**United States District Court**
**For the Northern District of California**

21

United States District Court
For the Northern District of California

**B.      Whether the ALJ Properly Rejected the opinions of Plaintiff's Treating and Examining Physicians.**

*1. Plaintiff's Treating Physician: Dr. Shah (Contra Costa Mental Health)*

Plaintiff argues that the ALJ improperly rejected the diagnoses from Contra Costa Mental Health and specifically Dr. Shah. (Motion at 13.) "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Nevertheless, in appropriate circumstances, the opinion of a treating or examining physician may be disregarded. *Id.* at 830-31. To reject such opinions, an ALJ must at a minimum give specific and legitimate reasons for rejecting the treating physician's opinion and those reasons must be supported by substantial evidence in the record. *Id.* at 830. Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Shah's written testimony that claimant has a psychotic disorder. (Motion at 13-14.) Here, the ALJ stated that the diagnoses from Contra Costa Mental Health vary throughout the record and were not consistent with the medical evidence as a whole. (Tr. 20.) Also, it was "not clear from the records if any of these diagnoses are actually based on an examination by a psychiatrist or psychologist." (*Id.*)

Plaintiff alleges that this reasoning "came out of the blue." (Motion at 13.) However, greater weight is not given to opinions of treating physicians without first considering the quality of their reports and their consistency with the medical record as a whole. *See* 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) (emphasis on consistency of opinion with record as a whole). *See also Magallanes*, 881 F.2d at 742. The ALJ points to several inconsistencies in the record (Tr. 20 (citing Exhibit 3F, p.10, Exhibit 3F, p.8, Exhibit 3F, p.3, Exhibit 9F, p.1)) where it is unclear whether the diagnoses were made by either a psychologist or a psychiatrist. On December 31, 2002, Alicia Tinnirello, an LMFT (licensed marriage and family therapist) diagnosed a psychotic disorder NOS. (Tr. 20., Exhibit 3F, p.10.) Similarly, K. Walker, LMW (neither a psychologist nor a psychiatrist) diagnosed a psychotic disorder NOS by history. (Tr. 20., Exhibit 3F, p.8.) Even after considering the post-hearing evidence presented by Plaintiff which clarifies that Dr. Shah, a psychiatrist, made subsequent diagnoses after the initial diagnoses made above (Tr. 270.), the diagnoses of Contra Costa Mental

22

1   Health are inconsistent with the medical record as a whole.[8]

2          Upon further examination of the record, the Court finds that the medical record as a whole

3   supports the ALJ's finding that Plaintiff does not suffer from a psychotic disorder.  The ALJ stated

4   that medical records from Contra Costa Health Services encompass treatment *primarily* for

5   depression and hemorrhoids. [emphasis added] (Tr. 20.)  On December 22, 2003, claimant's

6   depression was well controlled with medication.  (*Id.*)  Furthermore, Dr. Datta found no evidence of

7   "active psychotic processes" while examining Plaintiff (Tr. 157), and noted that Plaintiff showed

8   "his ability to control his so-called psychotic behavior." (Tr. 154.)  Plaintiff had admitted to Dr.

9   Datta that he smeared feces on the walls of a lockup room as his "primitive way " of getting

10  attention. (Tr. 155.)  Dr. Marinos found that while Plaintiff complained of hearing voices, there "was

11  no indication during the present evaluation of an overt psychotic disorder." (Tr. 165.)  While Dr.

12  Levine stated that he was suspicious about the possibility that Plaintiff has schizophrenia, he "did not

13  see any clear signs of [schizophrenia]" upon examination.  (Tr. 210-11.)  As a result, the ALJ was

14  reasonable in finding that the medical record as a whole supported the conclusion that Plaintiff did

15  not have a psychotic disorder.

16          The treating physician's opinion lacks consistency with the rest of the medical evidence on

17  record.  The Ninth Circuit has consistently held that "[t]he ALJ is responsible for determining

18  credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750; *see also*

19  *Allen v. Heckler*, 749 F.2d 577, 580 n.1 (9th Cir. 1985) (stating that "questions of credibility and

20  resolutions of conflicts in the testimony are functions solely for the Secretary").  Several doctors

21  refused to diagnose Plaintiff with schizophrenia and Dr. Shah (and Contra Costa Mental Health) was

22  the only physician to diagnose a psychotic disorder.  Thus, the ALJ properly discounted the evidence

23  from Contra Costa Mental Health and Dr. Shah based on the substantial evidence in the medical

24  record.

25

26          [8] The only alternative rational interpretation of this evidence is that the initial workers were
27  acting as agents of the psychiatrist as part of Plaintiff's treatment team. The Court declines to disturb
    the ALJ's conclusion where there were varying diagnoses, inconsistent with the medical record as a
28  whole, throughout the record.

United States District Court
For the Northern District of California

1    opinions of Plaintiff's treating and examining physicians.

2    **C.      Whether the ALJ Properly Rejected Plaintiff's Testimony**

3    In determining Plaintiff's residual functioning capacity ("RFC"), the ALJ considered not only

4    the objective medical evidence, but also the claimant's subjective symptoms and the extent to which

5    these symptoms can reasonably be accepted as consistent with the objective medical evidence. (Tr.

6    20.) Plaintiff argues that the ALJ improperly rejected Plaintiff's testimony about hearing voices, evil

7    thoughts, and depression because "specific cogent reasons" were not given. (Motion at 19.) The

8    Commissioner responds that the ALJ's credibility finding is supported by substantial evidence and is

9    proper as a matter of law. (Cross-Motion at 10.) The record shows that the ALJ considered

10   objective evidence, Plaintiff's noncompliance with medication for his allegedly disabling psychotic

11   impairment, and the improvement in Plaintiff's condition after being released from incarceration .

12   (Tr. 21, 160.)

13   In addition, the ALJ rejected Plaintiff's testimony because the written allegations of being

14   unable to work due to the impact of Plaintiff's impairments are not consistent with the objective

15   medical evidence presented, the statements made by Plaintiff to treating and examining physicians,

16   as well as Plaintiff's daily and social activities. In assessing credibility, the ALJ can consider several

17   factors and the Ninth Circuit has upheld an ALJ's credibility finding where the judge cited only three

18   factors: daily activities, medical evidence, and treatment. *Crane v. Shalala*, 76 F.3d 251, 254 (9th

19   Cir. 1996). Here, the ALJ noted that "the claimant's social and daily life is not indicative of

20   disabling clinical depression or other mental illness." (Tr. 21.) This is the link which shows that the

21   ALJ interpreted this as an "inherent conflict between these factors and the claimant's testimony."

22   (Motion at 12.) The ALJ acted reasonably in finding that a person with a mental illness so disabling

23   that he is prevented from working could not simultaneously maintain a steady relationship with a

24   girlfriend, do light housekeeping and prepare simple meals, and be involved with church work.

25   Also, the ALJ noted a complete lack of medical evidence which supports Plaintiff's assertion

26   that he is unable to work due to mental issues. (*Id.*) In fact, the claimant believes he can work and

27   wants to find a suitable occupational goal and employment with a continuous income according to

28   the reports of Drs. Sternitzke and Levine as well as Plaintiff's therapist and counselor, Mr. Stueland.

United States District Court
For the Northern District of California

1  (*Id.*)  The objective evidence of recorded statements to treating and examining physicians which

2  describe claimant's desire to work is inherently inconsistent with Plaintiff's allegations of disabling

3  mental impairments.  Plaintiff's lack of medical evidence to refute these recorded statements further

4  reduces Plaintiff's credibility.

5       Lastly, the ALJ considered the relative improvement in Plaintiff's condition after being

6  released from incarceration and being placed on medication to control his depression.  (Tr. 20.)  This

7  is substantial evidence which shows that the ALJ did not "arbitrarily reject [Plaintiff's] testimony."

8  *Crane*, 76 F.3d at 254.  Thus, the Court finds substantial evidence in the record to support the ALJ's

9  credibility finding.

**CONCLUSION**

11       For the reasons stated above,

12       IT IS HEREBY ORDERED THAT Plaintiff's Motion for Summary Judgment or Remand is

13  DENIED.  Defendant's Cross-Motion for Summary Judgment is GRANTED.

14       IT IS FURTHER ORDERED THAT the Clerk shall close the file and terminate any pending

15  matters.

16       IT IS SO ORDERED.

19  Dated: _/- 2 2_____, 2007

SAUNDRA BROWN ARMSTRONG
United States District Judge

United States District Court
For the Northern District of California